## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| v. | : | **Case No.  DLB-22-0209** |
| | : | |
| **NICHOLAS ROSKE,** | : | |
| | : | |
| **Defendant** | : | |

### RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM

Sophie Roske, the Defendant, by and through Andrew R. Szekely and Ellie Marranzini, Assistant Federal Public Defenders, hereby files this response to the government's sentencing memorandum at ECF 98.

None of the arguments advanced by the government supports a sentence within the advisory sentencing guidelines range. The government's arguments attempt to expand the offense conduct; misinterpret and downplay Ms. Roske's abandonment of her offense and surrender; and engage in only the most perfunctory analysis of Ms. Roske's mental health before baldly asserting the Bureau of Prisons can provide proper treatment to Ms. Roske. None of these arguments should persuade the Court that a sentence of 30 years' incarceration to life imprisonment is reasonable. And none undermines Ms. Roske's request for a sentence of 96 months.

### I.    Relying on Google searches and online messages, the government exaggerates the offense conduct.

The government's response details months of Ms. Roske's internet activity, including Google searches and communications on Discord. This catalog of Ms. Roske's internet history is an attempt to stretch this case beyond what Ms. Roske did and intended to do and have her offense conduct reach things she thought, but did not do. As any internet user knows, Googling

and doom-scrolling, even in dark corners of the internet, does not equate to criminal intent. A user's internet content is voluminous, intensely personal, and can easily be taken out of context.

In a case about an inchoate crime—here, an attempt—it is especially important to distinguish what Ms. Roske intended and took substantial steps to do from what she merely thought about during a period of severe depression but never acted upon. The former is a crime, one Ms. Roske has accepted responsibility for; the latter is not.

Ms. Roske's conduct was undeniably serious. The defense agrees with the government that the impact of Ms. Roske's plan—had it been carried out—would have been "immeasurable and staggering[,]" and that no judicial official should have to live in fear of violence based on a judicial decision. *See* ECF 98 at 19. But Ms. Roske's conduct did not encompass an attempt to target multiple justices or efforts to evade capture or hide evidence. The Court should sentence Ms. Roske for what she did, not for what she thought about.

> **a. Ms. Roske did not have a plan—and did not attempt—to target three justices, or anyone else.**

The fact that Ms. Roske conducted internet research into, and messaged a friend about, multiple justices is troubling. But the government's evidence does not support finding, by a preponderance of the evidence, that Ms. Roske planned or attempted to target anyone other than the associate justice she has pleaded guilty to targeting. At most, the facts support a finding that at some point Ms. Roske had an *idea* of targeting more than one justice that did not result in action. The government cites months of Google searches, including searches for shootings and serial killers, to insinuate that Ms. Roske began "researching" her crime months before she committed it. But there is a limit to the relevance of one's internet search history, which can easily be taken out of context or assigned more meaning than it is worth. Ms. Roske's case is no exception to this.

Ms. Roske's depression was worsening significantly in 2021 and 2022. Her family members and friends observed her withdrawal from people and things she used to love as she increasingly spent more and more time online. Research has long established a bidirectional relationship between poor psychological well-being (including depression and loneliness) and problematic internet usage: people with depression and loneliness are susceptible to developing compulsive patterns of internet use; compulsive internet use can negatively affect psychological well-being. Junghyun Kim, Robert LaRose, Wei Peng, *Loneliness as the Cause and the Effect of Problematic Internet Use: The Relationship between Internet Use and Psychological Well-Being*, 12 CyberPsych. & Behav. 451 (2009). Additionally, neuroscience research has found that compulsive internet use interacts with the same parts of the brain as drugs and alcohol, resulting in dopamine hits that create addictive cycles. Zoe Wyatt, *Wire for Want: How Dopamine Drives the New Epidemic of Everyday Additions*, 4 Psychiatry Behav. Health 1 (2025). [1] Given Ms. Roske's depression and isolation, it is not surprising that she increasingly lost herself online. And that very depression made her more susceptible to the gravitational pull of internet rabbit holes.  In the future, any concerning internet behavior will not go unnoticed, as Ms. Roske will be subject to a computer monitoring condition during her period of supervised release.

Many of Ms. Roske's internet searches from May and June 2022 are indisputably relevant to this offense. Indeed, she informed the 911 dispatcher and investigators that she had done research[2] and purchased supplies online in furtherance of her plan.[3] And some of her internet activity corroborates statements she made regarding her conduct. But many of her earlier

---

[1] Available at https://tinyurl.com/4xah73wx.
[2] Defense Sent'g Mem. Exhibit 10 (Redacted 911 Call Transcript) at 8.
[3] Defense Sent'g Mem. Exhibit 8 (Transcript, Recorded Interviews Redacted) at 27-28.

searches and online comments are not probative of much beyond the fact that she was in a dark place.

That Ms. Roske was looking for information about mass shootings does not mean she aspired to commit one; rather, it is consistent with someone who is concerned about the epidemic of gun violence in our country. Similarly, that she searched for information about serial killers does not mean she aspired to be one; rather, it is consistent with someone who has partaken in the "national obsession" with true crime. Phoebe Lette, *Is Our True-Crime Obsession Doing More Harm Than Good?* New York Times (Oct. 28, 2021).[4] The government's Attachment 10A includes only those search terms it deemed relevant to the offense conduct or otherwise nefarious; it does not include the many innocent terms Ms. Roske searched for, such as movies, TV shows, video games, information related to filing taxes, news stories, and other random things. Exhibit 1, Excerpts from Google Search Warrant Return.[5] It is difficult to parse an individual's search history and disentangle curiosity from intent.

Similarly, Ms. Roske's internet activity, without more, does not indicate an intent, let alone a criminal attempt, to target anyone else. The government points to a map with saved addresses and a Discord conversation Ms. Roske had with a friend in late May 2022 in which she stated "yeah but I could get at least one, which would change the votes for decades to come. And I am shooting for three." ECF 98 at 8. This, at most, shows that Ms. Roske had the *idea* of

---

[4] Available at https://tinyurl.com/5n9ye2ma.

[5] Exhibit 1 contains just five pages of a more than 12,000-page document. The excerpt shows, for example, searches for the horror film *All My Friends Hate Me* (p. 1), the BBC documentary series *By Reason of Insanity* (p. 1; on the same date that "insanity defense" was searched (*see* Gov. Att. 10A, ECF 98-3 at 44)); the movie *The Bourne Identity* (p. 2; same date of searches regarding lock-picking); the TV show *Barry,* a black comedy crime drama about a hitman (p. 3); the documentary *Conversations with a Killer: The Ted Bundy Tapes* (p. 4); the true-crime documentary series *Jimmy Savile: A British Horror Story* (p. 4); and numerous searches for Disney Plus content (p. 5).

targeting additional justices, but it does not establish—even by a preponderance—that she developed a criminal intent, let alone engaged in an attempt, to do so. Aside from searching for other justices' addresses, Ms. Roske had taken—and was intending to take—no steps to target additional justices. It was only with respect to the associate justice that Ms. Roske's conduct went "beyond internet searches," *see* ECF 98 at 21.

The evidence shows that Ms. Roske had plans to go nowhere after the justice's house. She informed investigators that her plan was to "shoot him and then shoot myself[,]"[6] emphasizing that her priority had been to kill herself. When asked what she would do if her plan had not worked out, she responded:

```
        MR. ROSKE:  Just kill myself, then.  I've been
actively suicidal for, I don't know, a long time now.
Before I was researching this, which researching things is
something I enjoy, so it's -- I don't know if I would have
been capable of actually doing it.
```
[7]

Ms. Roske gave a complete confession detailing her intentions and actions with respect to her offense conduct. Ms. Roske's confession was corroborated by evidence investigators found in her possession and in her internet accounts and digital devices. The evidence shows that Ms. Roske developed a plan and took steps in furtherance of that plan. Importantly, none of the steps

---

[6] Defense Sent'g Mem. Exhibit 8 (Transcript, Recorded Interviews Redacted) at 15. *See also* Defense Sent'g Mem. Exhibit 10 (Redacted 911 Call Transcript) at 8 ("Yes, I was going to kill myself.")
[7] Def. Sent'g Mem. Exhibit 8 at 16.

she took involved harming anyone, or herself. And thankfully, by the time her plan disintegrated, she was not even able to access her weapons[8] to harm herself, let alone someone else.

   **b.  Ms. Roske did not intend or attempt to "escape" or present a defense, as the government suggests.**

The government argues that Ms. Roske "preemptively researched potential escapes and defenses" by searching for terms like "does Iceland extradite to the us" and "insanity defense". ECF 98 at 23. But, again, that internet activity sheds little light on what Ms. Roske actually intended and planned to do. Her actions are more telling. Ms. Roske's actions on June 8, 2022, were not those of one trying to escape the consequences of one's actions or get away with a crime. In fact, they were the opposite. She called 911 and reported her thoughts and intentions. She revealed to police her location and what weapons she had. She remained in place as police arrived to arrest her. And she freely admitted to investigators the details of her conduct. Not because she was pursued by police or caught red-handed, but because she chose to abandon her plan. She chose to ask for help.

Ms. Roske did not take a single step in furtherance of either escaping the country or invoking a defense. She did not have a passport or international travel plans. During her interviews, she said nothing suggesting she was trying to invoke a defense or feigning insanity. She did not minimize or obfuscate her conduct in anyway.

Prior to traveling, Ms. Roske deactivated her Discord account and attempted to wipe her laptop. Ms. Roske acted alone and left California with a one-way ticket. *See* Exhibit 2, Delta Airlines Purchase History. The steps she took before traveling were meant to protect her friends

---

[8] Her (unloaded) firearm was inside a locked case, which was inside a suitcase that was zip-tied shut. Also inside the zip-tied suitcase were her knife and other burglary tools. Ms. Roske did not have a cutting implement in her direct possession at the time of her arrest.

and family from her actions and the scrutiny that would follow, when she thought that she would be dead. After her death, she hoped that her friends would not be dragged into her mess.

## II.    Ms. Roske's plan was disrupted by her voluntary abandonment of it, not by the security detail.

The government's memorandum claims that the attack was disrupted "only by the presence of law enforcement guarding the residence." ECF 98 at 23. This is not true. Ms. Roske voluntarily abandoned her plan and changed course. What is more, Ms. Roske's offense was discovered for one reason and one reason only: she abandoned her plan and called the police. The government ignores this fact, because it meaningfully distinguishes Ms. Roske's case from other recent acts of political violence where the preparators either were not apprehended alive or attempted to escape.

Ms. Roske's sentencing memorandum explains how, while she was still in the taxi arriving in the justice's neighborhood, she realized she could not go through with her plan. Def. Sent'g Mem. at 24–26, 35. But even if the Court credits the government's assertion that it was the presence of the Deputy U.S. Marshal that caused Ms. Roske to change course and walk past the house, it is abundantly clear that the presence of the security detail did nothing to provoke Ms. Roske to call 911 30 minutes later from a nearby street. The security detail did not interact with Ms. Roske, let alone confront or pursue her. Nor did they alert other law enforcement to Ms. Roske's presence or initiate any sort of investigation. As discussed in Ms. Roske's memorandum, after deciding not to go through with her plan, Ms. Roske could have done a number of things. She could have returned home, with suicidal and homicidal thoughts unaddressed. She could have abandoned her suitcase and checked into a hospital, disclosing only suicidal thoughts. Instead, she called 911 and disclosed her offense.

By doing so, she ensured that she no longer presented a safety risk to herself or anyone else. She ensured that her weapons would be seized and the full scope of her conduct could be

addressed by professionals. These actions were not self-interested, motivated by a desire to get away with anything, or a desire to escape. They show that she had thoroughly and unequivocally abandoned her plan, and felt compelled to reach out for help.

**III.    Ms. Roske is receiving different and markedly better treatment now than she was at the time of the offense.**

    **a.    During her pretrial detention, Ms. Roske's treatment has been adjusted and she has shown "significant clinical improvement."**

The government argues that Ms. Roske is receiving the same medical care she was receiving at the time of the offense and that the Bureau of Prisons is equipped to address her mental health needs. ECF 98 at 31. Not so.

As Ms. Roske explained in her sentencing memorandum, there have been significant changes in her treatment since her arrest and she has identified a robust treatment plan that will minimize her already low risk of reoffending. ██████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ ████████████████████████

██████████████████████████████

    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████atch

--------------------

█
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████

8

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

While Ms. Roske has demonstrated compliance and improvement during her treatment at Central Booking, there is no certainty she will receive the same level of care in the Bureau of Prisons. As discussed in her memorandum, multiple sources, including publications from the Department of Justice's Office of the Inspector General, cast serious doubt on the BOP's ability to adequately address mental illness due to severe understaffing and under-resourcing. *See* Def. Sent'g Mem. at pp. 41-43. On September 25, 2025, President Trump signed an executive order ending the BOP's collective bargaining agreement, injecting further uncertainty in an already strained system. John Yoon, *Federal Bureau of Prisons Ends Union Protections for Workers*, N.Y. Times (Sept. 26, 2025).[10]

---

[10] Available at: https://tinyurl.com/yfp722ju

### b. Ms. Roske has a history of self-disclosure when seeking treatment.

The government points out that Ms. Roske has had homicidal ideations in the past. While this is true, it is important to note two things: **first**, Ms. Roske's pattern of self-disclosure in pursuit of treatment, and **second**, that despite thoughts Ms. Roske had, her conduct always stopped short of harming anyone, herself included.

When Ms. Roske has been in her deepest states of depression, beginning at the age of 19, she has had suicidal and at times violent thoughts. Those thoughts have bothered her so much that she has repeatedly disclosed them to emergency responders and medical staff. These professionals have been able to evaluate Ms. Roske, provide her with treatment responsive to her symptoms, and assess whether she presents a risk to herself or others before discharging her.

Intrusive thoughts, including thoughts of hurting oneself or others, can be a symptom of mental illness. But a thought—even a scary thought—is not an impulse. After age 19, when Ms. ███████████████████████████████████, ███████████████████████████████████████ ███████████████████████████████████████. She and her sister remain extremely close to this day, and Ms. Roske has never engaged in a violent act toward her sister. Indeed, Ms. Roske knew her sister was the person she could reach out to in her greatest moment of crisis; and her sister's guidance and good judgment helped Ms. Roske navigate a dangerous, fraught situation.

Ms. Roske has a demonstrated pattern of compliance with treatment and openness with her treatment providers. Hopefully, her new medication regimen, and the eventual cessation of ███████ will mean Ms. Roske never has intrusive thoughts about violence again. But her honesty with providers, even about scary thoughts, shows Ms. Roske is willing to address these thoughts before they lead to a harmful cycle. This was true before her arrest. And it is even more true now.

### IV.    A guideline sentence would create an unwarranted sentencing disparity.

A sentence within the advisory sentencing guidelines range would create an unwarranted disparity with other sentences imposed in this District. *See* 18 U.S.C. § 3553(a)(6). Sentences of 30 years or more following guilty pleas are rare in the District of Maryland. Multi-decade sentences in this District are typically imposed for two primary categories of cases: homicides and sexual offenses involving the hands-on abuse of children or by recidivist offenders against children. As to latter category, those cases present complex public safety issues and a type of harm to victims that make them inapt comparators to Ms. Roske's offense.

A closer analogue are the homicide cases that are prosecuted in this District. Nearly all these cases involve murders committed in the course of either drug trafficking or other racketeering activities. In other words, the pleas and sentences encompass both choate murders *and* other serious federal offenses. Yet, many of these sentences are nonetheless the same or even lower than the sentence the government seeks here. *See e.g.*, *United States v. Cortez Weaver*, RDB-19-0144 (360-month sentence, Weaver's offense conduct including the retaliatory killing of a member of a rival drug trafficking conspiracy who had previously killed a member of Weaver's organization); *United States v. Terrell Plummer*, GLR-17-223 (300-month sentence imposed pursuant to Fed.R.Crim.P. 11(c)(1)(C), Plummer's offense conduct included the murder of a 3-year old bystander during a violent dispute with a rival drug trafficking organization, the incident resulted in the wounding of two other victims); *United States v. Dontray Johnson*, LKG-16-0267 (360-month sentence imposed, Johnson was a member the Bloods gang who, in addition to being part of a years-long drug conspiracy, murdered, in separate incidents, two members of his gang for breaking the gang's rules); *United States v. Noe Coreas-Meija*, PX-16-0444 (396-month sentence, Coreas-Meija, an MS-13 member, plotted and committed the murder of a victim who was cooperating with the authorities in the prosecution of his MS-13 clique in addition to on-going extortion of businesses and individuals).

The four instances of harm to judicial officers cited by the government further demonstrate how differently situated Ms. Roske is from the individuals involved in those cases. *See* Gov. Resp. at 28. In three of the four cases, tragically, the judges or their family were killed and the perpetrators killed themselves before being arrested. Ms. Roske, in contrast, reported her offense to the police before harming anyone and has accepted responsibility for her conduct.

The final case, involving a solicitation to murder a judge resulting in a sentence of 40 years, is helpful to the Court insofar as it demonstrates how starkly different Ms. Roske is from that defendant --- Matthew Hale. Hale was the "Pontifex Maximus" of a white supremacist group. *United States v. Hale*, 448 F.3d 971, 975 (7th Cir. 2006). He first came under federal law enforcement surveillance years prior to his solicitation to kill a judge. In 1999, one of his followers had gone on a "shooting rampage that left two persons dead and nine others wounded." *Id*. The targets were all members of racial or religious minorities. *Id*.

Hale's follower killed himself after his rampage. At his funeral Hale eulogized him. *Id*. First, he called the shooter a "very good man[.]" *Id*. Then he "praised [the shooter's] willingness to 'take action for his people, not to sit in the easy chair and allow life to go by but to go out into the world and spread our sacred message.'" *Id*. In addition to the exhortation to violence, Hale had been previously denied admission to the Illinois bar on the grounds that his "active commitment to bigotry under 'any civilized standards of decency' demonstrated a 'gross deficiency in moral character, particularly for lawyers who have a special responsibility to uphold the rule of law for all persons.'" *Hale v. Committee on Character and Fitness for State of Illinois*, 335 F.3d 678, 680 (2003).

Defendants like Hale are fundamentally different than Ms. Roske. Hale incited violence after his follower committed mass murder; Ms. Roske has expressed shame that anyone would be inspired by her actions. Hale was stopped by an undercover informant; Ms. Roske stopped

herself because she did not want to hurt anyone. Ms. Roske, in other words, took an exit ramp from her offense when given the chance, Hale did not. To impose sentences that are even remotely similar in these cases is directly counter to § 3553(a)'s directive that differently situated defendants, in terms of offense conduct and prior history, should receive sentences that acknowledge the differences.

Additionally, the government's sentencing request ignores that Ms. Roske self-reported her plans, intentions, and actions. In *United States v. Fox*, Fox was convicted after trial of participating in a militia plot to kidnap the Governor of Michigan. No. 1:20-cr-00183 (W.D. Mich.). At sentencing the court found a downward variance appropriate because Fox's case was a case where, thanks to law enforcement or the early report of a concerned citizen, the intended goal did not occur. *Id.*, ECF 851, Sentencing Tr. at pp. 34–35 (varying down from guideline range of life to sentence of 192 months). The sentencing judge stated:

> [W]hen conspiracies in the domestic terrorism or the foreign terrorism cases don't actually achieve their goals, when people aren't killed, thank goodness, when buildings aren't burned, thank goodness, when bombs don't go off, thank goodness, all because of the ability of law enforcement and confidential sources to pull the plug early, judges have reflected that in sentences actually imposed that are below where the guidelines would otherwise take them, and I think that's warranted. **It's warranted because in an inchoate offense setting the Court has to look at actual risk as well as intended outcome.**

*Id.* (emphasis added).

Here, the intended outcome did not occur because Ms. Roske backed out and called the police. Even if the Court credits the government's argument that the security detail disrupted the plan ( and for the reasons detailed above the Court should not), a variance is still warranted under the *Fox* court's reasoning because the actual risk of the intended outcome occurring was low. Even if Ms. Roske had persisted with her plans, she would have been stopped by the security

detail. And that reality warrants consideration in the sentencing analysis separate and apart from Ms. Roske's intentions.

Ms. Roske's role in the abandonment and self-report provides support for a substantial variance here. *See, also, United States v. Guerrero*, No. IP 02-122-CR, 2003 WL 23220736 (S.D. Ind. Dec. 3, 2003) (in pre-*Booker* sentencing of defendant who traveled from Indiana to Washington, D.C. with knife intending to kill the president, then checked into a hospital and disclosed plans, court departed downward to probation from the 33-41 month guideline range relying in part on the fact that the defendant's history of mental illness and self-reporting of her homicidal impulses and actions took the case outside of the heartland of typical cases).

## CONCLUSION

In a moment of acute crisis, Sophie Roske called for help. When she called, she was so honest she inculpated herself, unprompted and unpressured, in a serious offense. Ms. Roske's offense merits punishment, and this punishment has already begun by virtue of a prosecution and conviction. But her other actions that day merit significant mitigation of that punishment. With the combination of supervised release, robust community support, and an effective treatment regimen, Ms. Roske can live safely in the community.

The Court, for the reasons detailed above, outlined in Ms. Roske's memorandum, and to be developed at sentencing, should impose a sentence of 96 months' incarceration followed by a 25-year term of supervised release.

Respectfully submitted,

James Wyda
Federal Public Defender
 for the District of Maryland

_____
Andrew R. Szekely
Ellie Marranzini
Assistant Federal Public Defenders
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-3976
Email: andrew_szekely@fd.org
         ellie_marranzini@fd.org