IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. DLB-22-209 |
| | * | |
| NICHOLAS JOHN ROSKE, | * | |
| | * | |
| Defendant | * | |
| | * | |
| ****** | | |

**GOVERNMENT'S RESPONSE TO
DEFENSE SENTENCING MEMORANDUM**

The United States of America, through undersigned counsel, and pursuant to the Sentencing Order issued in the above-captioned matter, respectfully submits this response to the defendant's sentencing memorandum. This response, organized around the analysis of the sentencing factors set forth in 18 U.S.C. § 3553(a), is not intended to address every assertion or argument raised in the defendant's sentencing submission, but focuses on certain aspects that the Court may benefit from reviewing prior to sentencing.

The defendant's actions and intent — which were determined, focused, and undeterred for months — were extremely dangerous to the lives of multiple sitting judges, their family members, and the Constitutional judicial order. The sentence imposed in this case must send the powerful message, both to the defendant and to others who contemplate committing assassination to obstruct judicial independence, that these ends **never** justify the means and that the consequences **are not worth** engaging in these acts. The sentencing factors in this case compel a sentence of no fewer than 30 years to life, followed by lifetime supervised release.

1. **Nature and Circumstances of the Offense, 18 U.S.C. § 3553(a)(1)**

The defendant's actions on June 8, 2022 were only the latest among *months* of contemplation, planning, and continued and repeated decision points to carry out an assassination

attack on multiple sitting justices.  Each and every day, for months, the defendant affirmatively chose to continue with and effectuate the plan.  The defendant chose to continue and effectuate the plan when the defendant:

- researched guns and purchasing guns, *over 100* times;
- resolved to find out the addresses of *four* sitting Supreme Court justices;
- conducted online reconnaissance about the four justices *over 60* times;
- repeatedly sought to learn how to "avoid leaving evidence," the "insanity defense," and "how are mass murderers treated in prison;"
- purchased, on at least *9 different dates*, the instrumentalities needed to break into a home and commit murder;
- drove, on *four* separate occasions, to gun stores to purchase the gun, ammunition, and accessories and practice shooting;
- drove to Los Angeles International airport for a flight to Virginia, *twice*;
- booked, then *re-booked*, a flight to Dulles International airport;
- directed the taxi driver to the Associate Justice's address; and
- texted the defendant's sister during the taxi ride, believing that it would be the last communication before committing heinous acts.

It was not until the defendant saw, by the presence of law enforcement, that the defendant wouldn't be able to get away with the plan, and surrendered to law enforcement.  The defendant's own words confirm this: "*I noticed immediately that there were people sitting outside* and this was a very like empty neighborhood, so *I was like, okay, they're keeping a lookout*." ECF No. 64-7 at 10:16-20 (emphases added).  In other words, the defendant's surrender came only after the defendant had been noticed by law enforcement, and vice versa.  The defendant's plan was disrupted and deterred by a law enforcement presence, not abandoned.

2. **History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1)**

The defendant's history and characteristics show that the defendant has the capability and intelligence to be driven and purpose-oriented, and to take focused, sequential actions over a significant period of time to fulfill those intended purposes. They do not show that the defendant was incapable of making reasoned decisions or was lacking in life skills. For example, the defendant achieved the rank of Eagle Scout, requiring a commitment toward a purpose and demonstration of various life and survival skills. The defendant also applied for and obtained a substitute teacher job, requiring the disciplined skills of managing a classroom and teaching plans. In the immediate days prior to flying to Maryland, the defendant prepared by, among other things, getting a haircut, as shown in the excerpted images below.

 

*Compare id.* at ECF No. 98-3 (Attachment 8) at 20 (screenshot of defendant at Gun Store 2 on June 3, 2022) *with* **Attachment 15** (screenshots of defendant at Gun Store 2 on June 5, 2022).[1]

In addition, in carrying out the defendant's plan, the defendant drove to and from Los Angeles airport —an approximate one-hour drive each time from Simi Valley — a total of three times. *See* ECF No. 98-3 (Exhibit 6) at 2-4. Further, the defendant brought on the assassination trip multiple days' worth of medication. *See* ECF No. 76-11 (FBI Collection Log documenting a pill organizer case containing eight of one type of pill; four of another type of pill; and eight of a third kind of pill); *see also* ECF No. 106 (Defense Sentencing Memorandum, hereinafter "Defense Memo") at 24 (the defendant brought a "couple of days' worth of medication"). All of this demonstrates that the defendant, a grown adult with a college degree and a part-time substitute teaching job, was able to navigate the world and was fully capable of dedication to plotting and executing a deadly plan, notwithstanding any concurrent mental health diagnosis.

In other words, the defendant's conduct shows that the defendant was more than capable of independently planning for, and executing, the assassination mission. This included all the voluminous online research, multiple online purchases, and additional multiple in-store purchases the defendant made — all entirely and solely done by the defendant. Each of these actions was an affirmative, cognizant decision the defendant made, and deliberately carried out.

The defendant's independence and determination are also evident from the defendant's conversations. These conversations show that the defendant was undeterred from carrying out the

---

[1] The public version of Attachment 8 inadvertently did not include the last three pages that were included in the sealed version, which are of screenshots of the defendant at Gun Store 2 on June 5, 2022. Those pages are being filed publicly (with redactions as needed) as **Attachment 15**.

Similarly, the public version of Attachment 4 inadvertently did not include the last three pages that were included in the sealed version, which are of certain accounts associated with the defendant's cell phone. Those pages are being filed publicly (with redactions as needed) as **Attachment 16**.

plan, even when others pointed out that the defendant's ideological purpose would not succeed. Contrary to keeping an open, dissuadable mind, the defendant received and overruled competing arguments, and doubled-down on the plan to assassinate up to three Justices. Specifically, two individuals that the defendant exchanged messages with via Discord informed the defendant that killing the Associate Justice would not achieve the defendant's intended ends. In one Discord chat, the defendant wrote, "what do you think would happen if [last name of Associate Justice] died?" ECF No. 98-3 (Attachment 9) at 27. The response was, in part, that it wasn't clear if the Associate Justice was "the deciding factor." *Id*.[2] In another chat, in response to the defendant stating that the defendant wanted to "remove some people from the supreme court," the person stated "two dead judges ain't gonna do nothing," and "i see what you think will happen but I doubt it will work." *Id*. at 28-29.[3] In response to these messages, the defendant remained steadfast, stating that the defendant was "***shooting for 3***" judicial killings which would "change the votes for decades to come." *Id*. at 28. Even in the face of information and arguments to the contrary, the defendant deliberately decided to continue acting on the defendant's terrorist aim.

The defendant's assassination mission, *not* suicide, was the defendant's primary purpose in traveling cross-country to Virginia and Maryland. The defendant's decision-making and statements support this. For example, while planning the assassinations, the defendant was researching ways to, in the defendant's own words, "try to get away with it," by "avoid[ing] leaving evidence," by fleeing to a country with no extradition treaty with the United States, or through employing an insanity defense. The defendant's actions to delete evidence — by doing a

---

[2] The individual who the defendant was sending messages to is Mindy Kephart, one of the individuals who submitted a character letter for the defendant. ECF No. 106-2 (Def. Exhibit) at 26.

[3] The individual who the defendant was sending messages to is Alejandra Rosiles, one of the individuals who submitted a character letter for the defendant. ECF No. 106-2 (Def. Exhibit) at 22.

laptop "data wipe" and attempting to delete the defendant's Discord account — are more consistent with homicide and "try[ing] to get away with it," rather than suicide. Getting a haircut prior to flying cross-country with a suitcase packed with a gun and other weapons is also indicative of taking actions to facilitate a successful homicidal mission, not suicide. Further, at the scene, when Officer L.C. spoke with the defendant's sister on the phone, the defendant's sister disclaimed that the defendant had said anything about committing suicide. ECF No. 64-6 (Officer L.C. body-worn camera transcript) at 4:1-9 ("He didn't say he was going to kill himself? He didn't say that? [. . .] Do you know if he's been taking his medications? You believe so? Okay."). Further, the defendant told Detective M.D. that the defendant did not want "to have any kind of violent encounter with law enforcement," indicating that the defendant did not intend to commit suicide by cop. ECF No. 64-7 (MCPD Interview transcript) at 12. In addition, the defendant brought several days' worth of medication on the trip. These facts, coupled with all the months of intentional decision-making and action steps the defendant took, strongly show that the defendant's primary and only mission was homicide. And as described above, the defendant's actions changed only after seeing law enforcement protecting the residence, which would have made it more difficult to "get away with it."

### 3. Purposes of Sentencing, 18 U.S.C. § 3553(a)(2)

The Guidelines range appropriately reflects the seriousness of the offense and the "sufficient, but not greater than necessary" sentence. Indeed, attempted murder and terrorism, each on their own, are among the most serious crimes. In this case, the defendant committed both: attempted to commit murder *and* did so for terroristic purposes. While there may be other cases where the Guidelines range may overstate the seriousness of the offense and warrant a downward variance, this is not one of them. The Guidelines range, and full application of the terrorism enhancement, is entirely appropriate and warranted in this case.

In determining the appropriate sentence, the Court should consider that the statutory maximum for attempting to kill the public officials enumerated in 18 U.S.C. § 351(a), including any Justice of the United States, is life imprisonment. In other words, the Congress legislated that even the *attempt, without more*, to assassinate a specified public official warrants a maximum life penalty. This high penalty — the most serious non-death criminal penalty — comports with the immeasurable significance and impact of the crime. It also conveys a significant message to the public about the seriousness of the offense, and to impose a high cost (and therefore seek to deter) those who would commit the crime. The seriousness of this offense, and need to deter individuals from committing it, is such that Congress provided for a sentence of up to life imprisonment.

Here, the top of the applicable Guidelines range (at an offense level 42, and regardless of criminal history category) matches the maximum statutory penalty prescribed for this offense. This indicates that life imprisonment (as a Guideline sentence) is appropriate in cases involving the most serious facts and circumstances. It is hard to imagine a scenario other than death, for which there is the death penalty (18 U.S.C. § 3592), that presents a more sober factual scenario than this case. Indeed, had the defendant not pled guilty and been convicted by a jury, the defendant's offense level would have been 45, with a Guidelines provision of life imprisonment, without a range. This makes sense, as it must reflect the combined extremely serious nature of attempted murder and terrorism. Accordingly, the Court's consideration of mitigation arguments should be reflected in imposing, at lowest, a 30 year sentence, a significant reduction from a higher term of years and up to life. This significant reduction to no fewer than 30 years is more than adequate to account fully for the defendant's mitigation arguments.

A downward variance, either by a dilution of the terrorism enhancement, or imposing a sentence below the Guidelines range, would not satisfy the purposes of sentencing as set forth in

§ 3553(a). As for the terrorism enhancement, the enhancement should be applied. Even if there were different levels of terrorism enhancements (which there are not), there are perhaps few scenarios more deserving of the maximum enhancement than this one. Carrying out a plan to kill not one, not two, but up to three judicial officials — judges of the highest court in the country that leads a coordinate branch of government — to impact judicial decision-making is terrorism at its highest order. The application of the enhancement should reflect that profoundly dangerous aim. *United States v. Garey*, 383 F. Supp. 2d 1374 (M.D. Ga. 2005), cited in the Defense Memo, does not induce a different result. In *Garey*, the enhancement was applied in the PSR post-trial and resulted in a Guideline range of life (49/VI). *Id*. at 1375. The court found that the twelve-level adjustment was "based upon conduct for which the Defendant was neither indicted nor convicted," and accordingly imposed a six-level adjustment for the facts being akin to the "official victim" enhancement. *Id*. at 1380. That reasoning does not hold here — the indictment and the defendant's conduct in this case amply justify the enhancement.

Other cases cited in the Defense Memo are similarly not persuasive, where the facts of this case are virtually unparalleled, and application of the terrorism enhancement to the defendant's criminal history category results in no difference to the Guidelines range. The characterization of the terrorism enhancement in *United States v. Benkahla*, 501 F. Supp. 2d 748, 751 (E.D. Va. 2007) as "unequivocally severe" is read out of context, and inapplicable here. Benkahla was convicted of two counts of making false declarations to a grand jury, obstruction of justice, and making a false statement to an FBI agent. *Id*. at 751. The terrorism enhancement, which the court found applied because Benkahla obstructed a terrorism investigation, resulted in the Guidelines range increasing from 33-41 months (a 20/I), to 210-262 months (32/VI). *Id*. at 751, 759. The court reasoned that, because it was "unaware of any case in which a defendant has received 210 months

(17.5 years) for lying to a grand jury and a FBI agent," and that the "nature of making false statements is not considered as serious a crime as the Defendant's guideline range indicates," *id*. at 760, among others, a below-Guideline sentence was warranted. *Id*. at 762. Nonetheless, the court sentenced Benkahla to 121 months (notably at the same offense level as with the enhancement, level 32, and two more years than defense requests here). *See id*. Here, the conduct was undoubtedly far more grave than obstruction and false statements, and the Guidelines range at a level 42 is the same across criminal history categories.

*United States v. Alhaggagi*, too, was a case where the terrorism enhancement to the defendant's criminal history category resulted in a significantly different Guidelines range. In *Alhaggagi*, the enhancement altered the defendant's Guidelines range from 188-235 months (36/I) to 324-405 months (36/VI). 372 F. Supp. 3d 1005, 1008 (N.D. Cal. 2019). The court sentenced the defendant to 188 months. *Id*. On appeal, the circuit court reversed the application of the enhancement, finding that Alhaggagi's operation of six social media accounts for individuals he knew were sympathetic with ISIS was not sufficient proof of specific intent to commit terrorism. 978 F.3d 693, 695, 701 (9th Cir. 2020). Thus, not only is *Alhaggagi* inapposite because of the increased criminal history category making a difference in the Guidelines range — an effect not present here — the facts of this case abundantly support and fit squarely within the enhancement. Here, the defendant desired to murder multiple Supreme Court justices in furtherance of a personal political agenda, and to alter a pending judicial decision.

*Kimbrough v. United States*, 552 U.S. 85, 92 (2007) and *Spears v. United States*, 555 U.S. 261, 262 (2009), are both cases involving the crack versus powder cocaine disparity. In both cases, the Supreme Court recognized that the Sentencing Commission had taken an "emphatic [policy] position" against the disparity, which supported the district courts' Guidelines recalculation based

on a policy disagreement. 552 U.S. at 111, 555 U.S. at 262.[4] Even if this Court were open to varying from the "Guidelines based on a *policy* disagreement with them" as a general matter, *id.* at 264, this case is not well-suited for doing so. Here, the Guidelines consist of the attempted murder Guideline and the terrorism enhancement. Both of these are uncontested by the defendant, and given the overwhelming conduct in this case, both should apply without any dilution.

The defense's recommendation of a drastic downward variance to 8 years' imprisonment does not sufficiently account for any of the § 3553(a) factors, either alone or in combination. An 8-year sentence in this case would likely result in the defendant released back into the community within the next few years, when the defendant's age will be in the low 30's.[5] This, coupled with the proposed 25-year term of supervised release (versus lifetime supervised release), means that the defendant will be wholly unsupervised — without recourse — well before retirement age and potentially with half of a lifetime to live. The protection of the public, including public officials, requires more.[6]

The protection of the public is a prominent and dominant consideration here because of the nature and circumstances of the offense and the history and characteristics of the defendant. The defendant's conduct was not impulsive. It was thought out, debated, and planned. While the

---

[4] Notably, the sentences in both cases, even after the recalculations, were still significantly higher than the defense's recommended sentence here. In *Spears*, the court sentenced the defendant to 240 months (from a post-adjustment range of 210-262 months), *id.* at 262, and in *Kimbrough*, the sentence was to 180 months (from a range of 228-270 months), 552 U.S. at 92, 111.

[5] The defendant has been detained since June 2022, and good conduct time in the Bureau of Prisons results in approximately a 15% reduction in the sentence imposed. *See* 28 C.F.R. § 523.20 (inmates are awarded 54 days of good conduct time for each year of the sentence imposed).

[6] Though the PSR recommended a 25-year term of supervised release, it also recommended a 30-year term of imprisonment. PSR at 20. Probation may have a different view on the appropriate term of supervised release should the term of imprisonment be less than its recommendation.

defendant's family has vowed to assist the defendant, there may be times (unplanned or through no fault of the family) that the family is unavailable.  That moment of unavailability, which could be as fleeting as a split second, may result in harm coming to an individual, including the defendant.  Supervision by the U.S. Probation Office, even its highest level of supervision (which is not around-the-clock), cannot provide this assurance, either.  Nor can a supervised release requirement to take prescribed medication for mental health, as the defendant was able to commit this crime while already being prescribed and taking medication.[7]  The collateral consequence of the defendant being prohibited from legally possessing a firearm is insufficient, also.  The defendant could use the defendant's intelligence and determined nature to acquire a firearm illegally.  Alternatively, and more troublingly, the defendant could use a knife, as the defendant had researched ("***does twisting or dragging a knife cause more damage***") and brought to Maryland; or use any of the other non-firearm tools that the defendant brought to Maryland, such as a hammer and crowbar.  Notably, knives are the second most common weapon used in homicides in the United States,[8] and the defendant's disturbing extensive research showing extremely graphic penetrating knife neck wounds *mere days* before traveling to Maryland evidences that the risk of danger to the public cannot adequately be addressed through a firearm prohibition.  The most effective manner that adequately protects the public, given the extremely high risk and potential devastating impact, is removal from the community.

---

[7] The defendant started taking this medication in 2020, and brought several days' worth of it to Maryland.  Defense Memo at 18, 24; *see also* ECF No. 64-5 (MCPD interview footage) at 49:48-50:30 (the defendant specifying for EMTs the medication), ECF No. 74-9 (Initial Appearance transcript ) at 5 (The Court: "And have you been taking those medications as prescribed by a doctor?" The defendant: "Yes.").

[8] Harms, J. & Bush M., *A Comparative Analysis of Knife and Firearm Homicides in the United States*, Journal of Interpersonal Violence, Vol. 37 (2022) at 19-20, *available at* https://pubmed.ncbi.nlm.nih.gov/36148686/.

The Government vehemently disagrees that the message to be sent should only be directed to the "subset of individuals who have made plans but might abandon them." Defense Memo at 46. This attempt at framing the defendant's conduct highlights the dichotomy in defendant's sentencing arguments: the majority of the defendant's sentencing submission presents arguments based on the totality of the defendant's life; but in contrast, in evaluating and characterizing the defendant's criminal conduct and need for deterrence, the arguments narrow drastically to focus on a much more limited period of time, to when the defendant arrived at the Associate Justice's residence. As detailed above, the defendant's plans were thoughtfully crafted and acted upon over a period of months. And they were not abandoned — they were steadfastly carried through up until the defendant was disrupted by law enforcement's presence.

Deterrence in this case must send the message to all those who would plan to employ violence to achieve ideological ends, such as killing judges to change a judicial outcome. It must seek to stop individuals *well* before arriving at the front yard of a sitting judge. It must seek to stop individuals from developing a plan, from plotting four justices' addresses on a map, from accumulating burglary tools and dangerous weapons for use in the plan, and from traveling thousands of miles with a suitcase full of weapons. The message to be sent must make it explicitly and abundantly clear that the consequences for this criminal conduct, given its dangerousness and seriousness, are such that the ends ***never*** justify the means. In other words, a sentence of no fewer than 30 years to life, rather than 8 years, more adequately sends the message that committing violence against judicial officers is wholly condemned and affords deterrence to this kind of unfortunately increasing criminal conduct.

### 4. Bureau of Prisons, Pre-trial Detention, and Supervised Release Condition

Granting a significant downward variance for possible future circumstances at the Bureau of Prisons that have not come to pass — a prospective variance — also should not be part of the

Court's analysis. In addition, though the Defense Memo discusses BOP resource shortfalls, the BOP received earlier this year a $5 billion infusion, including $3 billion for staffing and training.[9] A downward variance for historical circumstances that the defendant did not experience (as the defendant has been in Marshals custody), and that may be different going forward, would also not be appropriate.

A downward variance for the conditions of the defendant's detention thus far is also not warranted, as the record shows that the defendant has been fairly treated. Starting with the defendant's first interactions with law enforcement on June 8, 2022, care has been taken to address the defendant's mental health and physical condition that requires medication. During the defendant's interview with a MCPD Detective, the Detective promptly requested that EMTs attend to the defendant. EMTs checked the defendant's vitals, and also worked to locate and provide the defendant's medication to take. Since the defendant's initial appearance, where the defendant consented to pre-trial detention, the Government is unaware of any difficulties raised about the defendant's pre-trial detention. Indeed, the Defense Memo acknowledges that when information was provided to the facility about a potential adjustment in the defendant's medication, a change was made. Defense Memo at 38. Granting a variance on this basis without particularization would introduce sentence disparities across all defendants in pre-trial detention.

The Government also objects to some of the proposed language in the Judgment and Commitment Order, namely the requirement that BOP provide a "detailed written response as to the reason for non-compliance" for placement at FCI Terminal Island. *See* Defense Memo at 64. Under 18 U.S.C. § 3621(b), BOP has the sole authority to "designate the place of the prisoner's

---

[9] The One Big Beautiful Bill Act and the BOP, Federal Bureau of Prisons (July 11, 2025), *available at* https://www.bop.gov/news/20250711-one-big-beautiful-bill-act-and-the-bop.jsp.

13

imprisonment." The statute provides certain considerations for BOP to take into account when designating a prisoner, including the Court's recommendation of "a type of penal or correctional facility as appropriate" and other "recommendations of the sentencing court." *See id*. The statute, however, does not provide for the Court to be further involved in that process, including being privy to BOP's internal deliberation and placement decision. *See id*. Nor is it accurate to render any designation decision by BOP other than the defendant's preferred facility to be "non-compliant." As Section 3621(b) lays out, there are a multitude of considerations that BOP takes into account when designating an individual. The statute does not provide for judicial insight into, or oversight of, BOP's (an agency within the Executive Branch) decision-making process. As the defense's BOP consultant's affidavit states, "The BOP attempts to accommodate judicial recommendations and historically has tracked compliance at over 70 percent." Defense Memo Exhibit 18 at 9. As is the standard practice, the Government does not object to a recommendation from the Court as to a facility recommendation, as explicitly contemplated by Section 3621(b), but does object to additional requirements imposed on BOP that are not authorized or contemplated by the statute.

The Court's sentencing decision on the appropriate term of years should also not be driven nor influenced by any impact of the length of the sentence on the defendant's potential designation to a low, medium, or high security prison, as the Defense Memo suggests. *See* Defense Memo at 51. Not only is that consideration not contemplated by the Section 3553(a) factors, it may also be inaccurate. As described above and in Section 3621(b), there are a multitude of considerations that the Bureau takes into account when designating an individual. Thus, even if the § 3553(a) factors permitted courts to configure a sentence to attempt to result in a certain-level security facility (which they do not), that attempt may not achieve the desired results, given the Bureau's

designation discretion. Further, an inmate's designation could change over time due to changes in an inmate's classification score (including conduct while in prison), or to changes in other inmates' classification scores (for example, if others are moved to different facilities, opening up bed space).

The Government agrees with Probation that the wording of Special Condition 8 (regarding a substance abuse treatment program supervised by Probation) should remain as stated, without the modification requested by defense. PSR at 18-19, 23; *see also* Defense Memo at 60 n.103.

The sentence here should rightly focus on the defendant's persistent and determined conduct; its dangerousness to life and also to judicial independence; the significant need for the sentence to send a strong message and to deter the defendant and others; and the important need to protect the public — specifically, judicial officers, anyone with whom the defendant disagrees, as well as anyone else the defendant determines to be "bad" and "deserve[s] it." For these and the other reasons explained in the Government's sentencing memorandum and accompanying materials, a sentence of no fewer than 30 years to life imprisonment, followed by lifetime supervised release, is the necessary and just sentence in this case.

                                                                               Respectfully submitted,

                                                                               KELLY O. HAYES
                                                                               United States Attorney

By:    /s/ Thomas M. Sullivan
       Thomas M. Sullivan
       Coreen Mao
       Assistant United States Attorneys

cc: Ashley Contreras, United States Probation Officer